GOVERNMENT
EXHIBIT

1

### AFFIDAVIT OF SPECIAL AGENT BRENDAN CULLEN
### IN SUPPORT OF COMPLAINT AND APPLICATION FOR SEARCH WARRANTS

I, Brendan Cullen, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Department of Homeland Security ("DHS"), United States Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI") assigned to the Boston, Massachusetts Field Office.  I have been employed by HSI and its predecessor, the United States Customs Service, since January 2003.  I am currently assigned to the Darknet/Cryptocurrency Investigations Group.  Before my assignment to the Boston Field Office, I was assigned to the HSI Providence Field Office, HSI Headquarters in Washington, D.C., and the HSI Philadelphia Field Office, where I was assigned to several different investigative groups.  I have investigated and assisted other agents in investigating numerous cases involving a variety of criminal violations including fraud, money laundering, narcotics trafficking, illegal importation and exportation of goods, and intellectual property theft.  I have received on-the-job training as well as participated in DHS-sponsored training courses on these types of investigations. My investigations and training have included the use of surveillance techniques and the execution of search, seizure, and arrest warrants.

2.      I am currently investigating:

(a)     MARK AROME OKUO ("OKUO"), also known as Anthony Terry, also known as Mark Robert, also known as Frank Michael; and

(b)     FLORENCE MWENDE MUSAU ("MUSAU"), also known as Precious Adams, also known as Catherine Muthoki

for various crimes, including but not limited to: wire fraud, bank fraud, and conspiracy to commit the same, in violation of Title 18, United States Code, Sections 1343, 1344, and 1349, respectively; money laundering and conspiracy to commit money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957, respectively; forgery or false use of a passport, in violation of Title 18, United States Code, Section 1543; making false statements to a bank, in violation of Title 18, United States Code, Section 1014; and aggravated identity theft, in violation of Title 18, United States Code, Section 1028A (collectively, the "Target Offenses").

3.      I submit this affidavit in support of a criminal complaint charging OKUO and MUSAU (collectively, the "Target Subjects") with conspiracy to commit wire and bank fraud, in violation of Title 18, United States Code, Section 1349.

4.      I also submit this affidavit in support of an application for a warrant to search the residence of OKUO and MUSAU, located at 32 Neponset Street, Apartment 1206, Canton, Massachusetts, 02021 (the "Subject Premises"), as further described in Attachment A-1, because there is probable cause to believe that it contains evidence, fruits, and instrumentalities of the Target Offenses, as further described in Attachment B.  As set forth below, there is probable cause to believe that evidence, fruits, and instrumentalities of the fraud scheme committed by OKUO and MUSAU will be found where they reside, including on their cellular phones and computers.

5.      I also submit this affidavit in support of applications for warrants to search a black 2013 Lexus RX 350 with Massachusetts license plate number 1CPR39 and VIN 2T2BK1BA8DC160567 ("Subject Vehicle 1"), as described in Attachment A-2, and a green 2008 Toyota Camry with Massachusetts license plate number 5EA524 and VIN 4T1BK46K98U565866 ("Subject Vehicle 2"), as described in Attachment A-3, because there is probable cause to believe

that they contain evidence, fruits, and instrumentalities of the Target Offenses, as described in Attachment B.

6.      The facts in this affidavit come from my participation in this investigation, including my personal observations and review of records, interviews conducted by me and by other law enforcement agents, my training and experience, and information obtained from other agents and witnesses.  In submitting this affidavit, I have not included every fact known to me about this investigation.  Rather, I have included only those facts that I believe are sufficient to establish probable cause for: (1) the criminal complaint charging OKUO and MUSAU with conspiracy to commit wire and bank fraud, in violation of Title 18, United States Code, Section 1349; and (2) the search warrants for the Subject Premises and the Subject Vehicles.

## PROBABLE CAUSE TO BELIEVE A CRIME WAS COMMITTED

### A.      The Target Subjects

7.      OKUO, age 41, resides at the Subject Premises in Canton.  From approximately March 2018 through November 2020, OKUO resided at 43 Wilcock Street, Apartment 2, Dorchester, Massachusetts (the "OKUO Dorchester address").  OKUO is a citizen of Nigeria. Photographs of OKUO that were obtained from United States Citizenship and Immigration Services ("USCIS")[1] and the Massachusetts State Police are below:

---

[1] According to records, OKUO entered the United States on a tourist visa in or about 2016. In or about 2019, USCIS denied a petition to adjust his immigration status based on his alleged marriage to an American citizen, finding that the marriage was fraudulent and that OKUO lied during an interview with a USCIS agent.  Accordingly, OKUO presently has no legal immigration status in the United States and is deportable.



*Fig. 1.1, 1.2: Mark Arome OKUO*

8.     MUSAU, age 36, resides at the Subject Premises in Canton with OKUO.  MUSAU

is a citizen of Kenya.[2]  Below is a photograph of MUSAU obtained from USCIS:



*Fig. 2: Florence Mwende MUSAU*

---

[2] In or about 2018, MUSAU entered the United States on a tourist visa.  In or about 2020, an American citizen residing in Dallas, Texas filed a petition for adjustment of status on behalf of MUSAU based on their alleged marriage, even though MUSAU was living in Massachusetts.  The petition for adjustment of status remains pending.

B.     **Background of the Scheme**

9.      As set forth below, between approximately 2018 and the present, OKUO and MUSAU, together with others known and unknown, engaged in a scheme to defraud victims via online romance scams, and MUSAU also engaged in a scheme to fraudulently obtain pandemic unemployment benefits.   As part of the schemes, OKUO and MUSAU used aliases and fake passports (as well as their own names) to open bank accounts in and around Boston in order to collect and launder the proceeds of the fraud, and then rapidly executed large cash withdrawals from the accounts, generally structured in amounts less than $10,000, in an effort to evade detection.[3]

10.     Over the course of the scheme, at least $1.3 million in fraud proceeds was transferred or deposited into accounts in the names of OKUO, MUSAU, and the aliases set forth below.

C.     **The Romance Scams**

11.     A "romance scam" generally involves perpetrators creating fictitious profiles on online dating or social websites, gaining the trust of potential victims, and then directing those victims to transfer money under false pretenses.

## <u>Victim-1</u>

12.     In or about December 2018, Victim-1, who is a resident of Illinois, met an individual, Co-Conspirator-1 ("CC-1"), through an internet dating website.  CC-1 told Victim-1 that he was a member of the United States Army serving in the Middle East.  As their online

---

[3] Federal law requires financial institutions to report currency transactions over $10,000 conducted by, or on behalf of, one person, as well as multiple currency transactions that aggregate to be over $10,000 in a single day.  *See* 31 U.S.C. §§ 103.22, 5313.

relationship developed, CC-1 discussed with Victim-1 his desire to obtain early military retirement benefits and return to the United States to marry her.

13.    To verify his purported identity, CC-1 sent Victim-1 a photograph of a United States passport in his name and photographs of a man wearing a military uniform.  Based on a review of records, I have determined that no United States passport has been issued to a person in the name of CC-1 with that passport number.

14.    Later, a second individual, Co-Conspirator-2 ("CC-2"), contacted Victim-1 and told her that he was CC-1's supervisor and a military general.  CC-2 advised Victim-1 that funds were necessary for CC-1 to apply for his military retirement benefits.

15.    From in or about December 2018 until June 2019, CC-1, CC-2, and others instructed Victim-1 to wire funds to various bank accounts owned by purported "friends" of CC-1.  In doing so, they provided Victim-1 with wiring instructions including account names, account numbers, and routing numbers.  CC-1, CC-2, and others provided Victim-1 with a variety of justifications for the requested funds, including: additional administrative costs to obtain early retirement benefits for CC-1; security for CC-1; and transportation expenses for CC-1.

16.    For example, on or about February 14, 2019, CC-2 notified Victim-1 that CC-1's military convoy had purportedly been attacked.  To ensure CC-1's safe travel, CC-2 requested that Victim-1 send $15,000 to help pay for additional security.  CC-2 instructed Victim-1 to send the funds to an account in the name of "Anthony Terry" with an account number ending in -7420 at Citizens Bank in Boston, Massachusetts.  Victim-1 complied.

17.    At the instruction of CC-1, CC-2, and others, Victim-1 wired at least $137,000 to Massachusetts bank accounts, as set forth in the table below, based on the understanding that the funds would assist CC-1 in returning to the United States.

6

| Date | Amount | Bank | Account Name | Account # |
|------|--------|------|--------------|-----------|
| 2/15/2019 | $15,000 | Citizens Bank | Anthony Terry | -7420 |
| 3/13/2019 | $25,000 | Bank of America | Catherine Muthoki | -2678 |
| 3/22/2019 | $15,000 | Bank of America | Florence Musau | -8111 |
| 4/16/2019 | $22,000 | TD Bank | Florence Musau | -2094 |
| 5/13/2019 | $20,000 | TD Bank | Florence Musau | -2094 |
| 5/13/2019 | $20,000 | Santander Bank | Catherine Muthoki | -0257 |
| 5/28/2019 | $20,000 | Santander Bank | Catherine Muthoki | -0257 |

### Victim-2

18.     In or about February 2020, Victim-2, who is a resident of Illinois, met an individual, Co-Conspirator-3 ("CC-3"), on a social media application, and they developed an online relationship.  CC-3 told Victim-2 that he was a member of the United States Army stationed in Africa, and he advised her that he wanted to return home from the military to live with her. According to CC-3, however, his "commander" required a payment in order for him to return home.

19.     From in or about March 2020 through in or about June 2020, CC-3 requested that Victim-2 wire money to pay off his commander, and he provided Victim-2 with various bank accounts and wiring instructions.

20.     On or about May 18, 2020, CC-3 instructed Victim-2 to send $8,000 to a Bank of America account in Massachusetts, with an account number ending in -9066, in the name of "Precious Adams."  Victim-2 complied.

**Victim-3**

21.     In or about December 2019, Victim-3, who is a resident of Georgia, met an individual, Co-Conspirator-4 ("CC-4"), on a social media application, and they developed an online relationship.  CC-4 told Victim-3 that he resided in Kuwait after retiring from the oil industry.

22.     CC-4 professed his love to Victim-3 and told her that he wanted to return to the United States, where he said he previously lived.  CC-4 told Victim-3 that he did not have enough money to fund his return, and he requested that she send him money to do so.  CC-4 provided Victim-3 with wiring instructions for bank accounts of purported friends and relatives to which he directed Victim-3 to send the funds.

23.     On or about January 8, 2020, CC-4 instructed Victim-3 to send $4,700 to a Santander Bank account in Massachusetts, with an account number ending in -1963, in the name of "Anthony Terry."  Victim-3 complied.

**Victim-4**

24.     In or about January 2020, Victim-4, who is a resident of Ohio, met an individual, Co-Conspirator-5 ("CC-5"), on a social media application, and they developed an online relationship.  CC-5 told Victim-4 that he was a member of the military stationed in the Middle East, and he advised her that he wanted to leave the military and return to the United States.  CC-5 advised Victim-4 that in order for him to return to the United States, however, his supervisor required him to find and fund a replacement soldier.

25.     Shortly thereafter, Victim-4 was contacted by an individual, Co-Conspirator-6 ("CC-6"), purporting to be a military general and CC-5's supervisor.  CC-6 advised Victim-4 that

that the family of a replacement soldier required financial support for the replacement soldier to take CC-5's place in the military.

26.     CC-6 instructed Victim-4 to send $37,500 to the Santander Bank account in Massachusetts, ending in -1963, in the name of "Anthony Terry."  Victim-4 complied.

### Victim-5

27.     In or about January 2020, Victim-5, who is a resident of California, met an individual, Co-Conspirator-7 ("CC-7"), on a social media application, and they developed an online relationship.  CC-7 told Victim-5 that she was working at a United Nations refugee camp in the Middle East and advised him that she wanted to leave the camp to start a new life with him in the United States.  Further, CC-7 advised Victim-5 that she had a significant amount of cryptocurrency that was inaccessible to her while in the refugee camp.  She requested financial support from Victim-5 for the purposes of obtaining a United States visa, traveling to the United States, and accessing her cryptocurrency to share with him.

28.     CC-7 informed Victim-5 that a purported United States citizen named Precious Adams, who was doing missionary work in the same refugee camp, would be able to receive the funds on behalf of CC-7.  CC-7 instructed Victim-5 to send $7,800 to a Citizens Bank account in Massachusetts, with an account number ending in -8439, belonging to Adams.  Victim-5 complied.

### D.     The Pandemic Unemployment Fraud

29.     On or about March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") was signed into law.  The CARES Act created a new temporary federal unemployment insurance program for pandemic unemployment assistance ("PUA").  PUA provided unemployment benefits for individuals who are not eligible for other types of unemployment (*e.g.*, self-employed and gig-economy workers, independent contractors, etc.).

9

30.     The Massachusetts Department of Unemployment Assistance ("DUA") administers and manages the PUA program in the Commonwealth of Massachusetts.  As part of the PUA application process with the DUA, a claimant must provide their first and last name, social security number, date of birth, and home address.  In addition, the claimant must select a preferred payment method of direct deposit or a debit card.  PUA claims submitted to the DUA are processed via a server in Colorado.  I understand that PUA claims are frequently submitted via the internet, and that individuals who either submit PUA applications to the DUA or receive PUA benefits cause wires to be transmitted to and/or from this Colorado-based server.

31.     As further detailed below, MUSAU used a fake passport to open a bank account that received proceeds of pandemic unemployment fraud, including benefits stemming from PUA claims in the name of a woman ("Victim-6") and a man ("Victim-7"), both of whom work in Massachusetts, and neither of whom applied for such benefits.

### Victim-6

32.     On or about May 15, 2020, a PUA claim was submitted to the DUA via the internet in the name of Victim-6 using her personal identifiable information, including her date of birth and social security number.

33.     On or about May 20, 2020, DUA deposited approximately $10,820 in PUA funds, via 10 separate deposits, to the Citizens Bank account in Massachusetts, with an account number ending in -8439, in the name of Precious Adams.

34.     I am aware, based on an interview of Victim-6, that she is employed full-time in Massachusetts, did not submit a PUA claim, and did not authorize anyone to submit a PUA claim on her behalf.  Victim-6 does not know anyone by the name of Precious Adams or Florence MUSAU.

10

**Victim-7**

35.     On or about May 30, 2020, a PUA claim was submitted to DUA via the internet in the name of Victim-7 using his personal identifiable information, including his date of birth and social security number.

36.     On or about June 3, 2020, DUA deposited approximately $9,096 in PUA funds, via 11 separate deposits, into the same Citizens Bank account in the name of Precious Adams.

37.     I am aware, based on an interview of Victim-7, that he did not submit a PUA claim or authorize anyone to file a PUA claim on his behalf, and he does not know anyone by the name of Precious Adams or Florence MUSAU.[4]

### E.     Fraudulent Bank Accounts Opened by OKUO and MUSAU

38.     As set forth in further detail below, OKUO and MUSAU used fake passports to open Massachusetts bank accounts in the names of the aliases used in the romance and pandemic unemployment scams described above, and in the names other aliases.[5]  Those bank accounts received large wire transfers and deposits, including proceeds of the romance and pandemic unemployment scams.  OKUO and MUSAU then quickly withdrew the fraudulent proceeds in structured amounts, thereby maximizing withdrawals before the funds could be recalled or the frauds could be detected.  Based on my training and experience, this pattern is consistent with a strategy frequently employed by perpetrators of fraud schemes in order to evade detection.

---

[4] In or about May 2020, the -8439 Citizens Bank account in the name of Precious Adams received approximately $8,340 in additional PUA payments from the Washington State Employment Security Department in the name of a third claimant.

[5] MUSAU and OKUO also opened bank accounts in their own names, using the same identifying information (*e.g.*, addresses and e-mail accounts) as they used to open the accounts in the names of aliases.

39.     For example, on or about January 16, 2019, OKUO used the alias Anthony Terry to open a Citizens bank account ending in -7420 (the "Citizens Terry account").  The address listed on statements for the Citizens Terry account was the OKUO Dorchester address.   To open the account, OKUO provided the bank with a Nigerian passport in the name of Terry, with a passport number of A04813555 and a date of birth of 02/07/1980.  An image of that passport, which OKUO also provided to other banks in opening additional accounts in the name of Terry, is below:



Fig. 3: Anthony Terry
fake passport

40.     I am aware, based on a review of records, that no individual using the name Anthony Terry with that date of birth and passport number has entered the United States.  The photograph on the fake Terry passport appears to be OKUO.

12

41.     From in or about February 2019 through May 2019, the Citizens Terry account received more than $76,000 in wire transfers and deposits.  OKUO quickly depleted those funds, principally through structured cash withdrawals, and he abandoned the account in May 2019 with a minimal balance.

42.     For example, on or about February 15, 2019, the Citizens Terry account received $15,000 in romance scam proceeds from Victim-1.  Shortly thereafter, OKUO withdrew those funds from the account in a series of structured transactions.  As one example, on or about February 17, 2019—two days after the Victim-1 wire transfer—OKUO withdrew approximately $5,000 from the account at a bank branch in Dorchester.  The following are bank surveillance photographs of OKUO withdrawing the funds:



*Fig. 4.1, 4.2: OKUO withdrawing $5,000 from Citizens Terry account two days after the wire transfer from Victim-1*

43.     On or about the same day that OKUO opened the Citizens Terry account, he used the same fake Nigerian passport to open a Bank of America account ending in -3250 (the "Bank of America Terry account") in Roxbury, Massachusetts.  The address listed on the Bank of America Terry account was the OKUO Dorchester address.

13

44.     In opening the Bank of America Terry account, OKUO provided the bank with the e-mail address aroomyk@hotmail.com (the "OKUO Hotmail address"), which is the same e-mail address that OKUO provided to banks in opening accounts in his real name, such as an East Boston Savings Bank account ending in -6161 (the "EBSB OKUO account").

45.     From approximately January through August 2019, the Bank of America Terry account received more than $100,000 in wire transfers and deposits.  Using his alias of Terry, OKUO rapidly depleted the funds from this account, principally through structured cash withdrawals.  For example, OKUO withdrew $6,000 on April 17, 2019; $6,000 the following day; and $5,000 four days later.

46.     In or about September 2019, after OKUO had withdrawn all of the funds, the Bank of America Terry account was closed with no remaining balance.

47.     That same month, OKUO used the same fake Nigerian passport in the name of Terry to open a Santander Bank account ending in -1963 (the "Santander Terry account") in Roxbury, Massachusetts.  In opening the Santander Terry account, OKUO provided the bank with the OKUO Dorchester address and the OKUO Hotmail address.

48.     From in or about September 2019 through March 2020, the Santander Terry account received approximately $91,000 in wire transfers and deposits, including proceeds of the romance scams discussed above, and OKUO quickly depleted the funds through structured cash withdrawals.

49.     For example, on or about January 8, 2020, the Santander Terry account received a $4,700 wire transfer from Victim-3.  On or about the same day, OKUO withdrew approximately $4,100 of those romance scam proceeds in three separate transactions in and around Boston.  The

following day, OKUO withdrew an additional $560 of the romance scam proceeds via an ATM transaction.

50.     On or about January 23, 2020, the Santander Terry account received a $37,500 wire transfer from Victim-4.  On or about the same day, OKUO withdrew approximately $6,500 of those romance scam proceeds from a Santander branch location in Boston.

51.     Shortly thereafter, before OKUO could withdraw any additional funds, Santander restricted withdrawals from this account because Victim-4's bank reported the transfer as potentially fraudulent.  After the Santander Terry account was frozen, OKUO incurred four ATM transaction fees in February 2020 to check the status and balance of the account.  On or about March 23, 2020, Santander confirmed that the transfer from Victim-4 was the result of fraud and returned the remaining funds in the Santander Terry account (approximately $33,000) to Victim-4's bank.  Following this transfer, OKUO abandoned the account and did not contact Santander to inquire why $33,000 had been returned to Victim-4.

52.     On or about January 11, 2020 (the same month that the Santander Terry Account was frozen), OKUO used the same fake Nigerian passport in the name of Terry to open a TD Bank account ending in -5401 (the "TD Terry account") in West Roxbury, Massachusetts.  In opening the TD Terry account, OKUO provided the bank with the OKUO Dorchester address and the OKUO Hotmail address.

53.     Below are surveillance photographs of OKUO opening the TD Terry account on or about January 11, 2020 using the fake Terry passport:

15



*Fig. 5.1, 5.2: OKUO*
*opening TD Terry account*

54.     In or about February 2020, this account received more than $26,000 in wire transfers and deposits.  Shortly after the transfers, OKUO rapidly executed structured withdrawals in and around Boston.  OKUO was captured by surveillance cameras on numerous occasions withdrawing funds from the TD Terry account, including several branch withdrawals requiring OKUO to present the fake Terry passport as identification.

55.     For example, on or about February 3, 2020, the TD Terry account received a $2,500 wire transfer.  On or about the same day, a TD surveillance camera captured OKUO, wearing an "Arsenal" soccer jacket, making an ATM withdrawal from the TD Terry account in Roslindale, Massachusetts.  Below, a photograph of that withdrawal is compared to a photograph of OKUO conducting an ATM transaction in the EBSB OKUO account (an account in his own name) while wearing the same jacket on April 20, 2020 in Boston:



| | |
|---|---|
| *Fig. 6.1: OKUO withdrawal from TD Terry account* | *Fig. 6.2: OKUO withdrawal from OKUO EBSB account* |

56.     In reviewing dozens of photographs of OKUO conducting transactions in the TD Terry account and in the OKUO EBSB account, I have identified numerous similar instances of him wearing the same clothing and hats while withdrawing funds from both accounts.

57.     On or about February 11, 2020, the TD Terry account received a wire transfer of approximately $2,034.  On or about the same day, OKUO withdrew $500 from the TD Terry account at a drive-through ATM in Roslindale, as well as $1,500 inside the same Roslindale branch using the Terry passport:





Fig. 7.1, 7.2: OKUO withdrawals from
TD Terry account on February 11, 2020

58.   Later in February 2020, OKUO executed several large structured cash withdrawals

from a TD branch in Roslindale.  After a deposit of approximately $19,500 in the TD Terry account

on February 13, 2020, OKUO withdrew $8,000 from the TD Terry account on February 14, 2020,

and an additional $6,000 on February 18, 2020, again using the fake passport:



| Fig. 8.1: OKUO withdrawal from TD Terry account on February 14, 2020 | Fig. 8.2: OKUO withdrawal from TD Terry account on February 18, 2020 |

59.     OKUO abandoned the TD Terry account in March 2020—with a balance of more than $5,000—after the wire transfer from Victim-4 to the Santander Terry account was discovered to be fraudulent.

60.     MUSAU likewise used an alias, Precious Adams, to open bank accounts to launder and access the proceeds of fraudulent schemes, including the romance scams and pandemic unemployment fraud discussed above.

61.     For example, on or about June 8, 2020, MUSAU used the alias Precious Adams to open a TD Bank account ending in -6293 (the "TD Adams account") in Boston, Massachusetts. To open the account, MUSAU provided the bank with a South Africa passport in the name of Adams, with a passport number of A06593164 and a date of birth of 09/18/1989. An image of that passport, which MUSAU also provided to other banks in opening accounts in the name of Adams, is below:



Fig. 9: Precious
Adams fake passport

62.     I am aware, based on a review of records, that no individual using the name Precious Adams with that date of birth and passport number has entered the United States.  The photograph on the fake Adams passport appears to be MUSAU.

63.     From in or about June 2020 to November 2020, the TD Adams account received more than $39,000 in wire transfers and deposits.  Shortly after those funds were received, MUSAU executed structured withdrawals and abandoned the account.

64.     For example, on or about June 15, 2020, bank security cameras captured MUSAU depositing a $24,363 cashier's check—payable to Adams—at a branch location in Newton, Massachusetts:



Fig. 10: MUSAU depositing check as
Precious Adams on June 15, 2020

65.     On or about June 17, 2020, MUSAU withdrew $4,500 from the TD Adams account,

and the bank recorded the Adams passport number on the withdrawal receipt:



Fig. 11: Receipt of withdrawal from
TD Adams account by MUSAU

66.     Further, MUSAU was captured by surveillance cameras executing ATM

withdrawals from the TD Adams account on several occasions, including on June 21, 2020 and on

21

August 27, 2020.  The red car driven by MUSAU during the August 27, 2020 withdrawal had a

license plate of 1CPR39, and I have witnessed that license plate now affixed to a black Lexus SUV

(Subject Vehicle 1) parked outside of the Subject Premises (the residence of MUSAU and OKUO)

as recently as March 2021.



*Fig. 12.1: June 21, 2020*
*withdrawal from TD Adams*
*account by MUSAU*

*Fig. 12.2: August 27, 2020*
*withdrawal from TD Adams*
*account by MUSAU*

    67.      OKUO also withdrew funds from the TD Adams account.  For example, on or about

October 2, 2020, OKUO executed an ATM withdrawal from this account in Roslindale, and one

day later, he executed another withdrawal at a drive-up ATM in Roslindale.  Based on a review of

video, the vehicle driven by OKUO during the October 3, 2020 transaction appears to be Subject

Vehicle 2:

22



Fig. 13.1: October 2, 2020
withdrawal from TD Adams
account by OKUO

Fig. 13.2: October 3, 2020
withdrawal from TD Adams
account by OKUO

68.     In or about November 2020, MUSAU abandoned the TD Adams account with a balance of $0.96.

69.     Similarly, on or about September 13, 2019, MUSAU used the same fake South Africa passport in the name of Adams, but with a photograph appearing to be MUSAU, to open a Citizens Bank account ending in -8439 (the "Citizens Adams account").  To open the account, MUSAU provided the bank with the OKUO Dorchester address and the OKUO Hotmail address.

70.     From in or about September 2019 to June 2020, this account received more than $57,000 in wire transfers and deposits, including romance scam proceeds from Victim-5 and proceeds from pandemic unemployment fraud.  Shortly after these transfers and deposits, MUSAU quickly withdrew funds from the account in structured amounts.

71.     For example, on or about February 25, 2020, the Citizens Adams account received $7,800 in romance scam proceeds from Victim-5.  On or about February 26 and 27, 2020, MUSAU—posing as Adams—withdrew $7,500 in four separate branch and ATM transactions.

72.     On or about May 20, 2020, approximately $10,820 in benefits from Victim-6's fraudulent PUA claim was deposited in the Citizens Adams account.  On or about the same day,

MUSAU used the Adams passport to withdraw $8,000 from the Citizens Adams account at a branch in Roslindale:



*Fig. 14.1, 14.2: May 20, 2020 withdrawal from Citizens Adams account by MUSAU*

73.     On or about June 3, 2020, approximately $9,096 in benefits from Victim-7's fraudulent PUA claim was deposited in the Citizens Adams account.  On or about the same day (wearing the same shirt as she did during the May 20 withdrawal), MUSAU used the Adams passport to withdraw $8,500 from the same Citizens Bank branch:



*Fig. 15.1, 15.2: June 3, 2020 withdrawal from Citizens Adams account by MUSAU*

74.     As yet another example, on or about September 21, 2019, MUSAU used the same fake South Africa passport in the name of Adams to open a Santander Bank account ending in -4817 (the "Santander Adams account").  To open the account, MUSAU provided the bank with the OKUO Dorchester address.

75.     From in or about January 2020 to April 2020, the Santander Adams account received more than $33,000 in wire transfers and deposits.  Shortly after these wire transfers, MUSAU quickly withdrew funds from this account in structured amounts.

76.     For example, on or about February 24, 2020, the account received a $5,900 wire transfer, and over the next two days, MUSAU withdrew $5,600 in three separate transactions at Santander locations in and around Boston.

77.     Further, on or about March 9 and 10, 2020, the account received $23,000 in wire transfers, and the following two days, MUSAU withdrew more than $11,000 in five separate transactions in and around Boston.

78.     Thereafter, on or about May 4, 2020, MUSAU used the same fake South Africa

passport to open a Bank of America account ending in -9066 (the "Bank of America Adams account") in Newton, Massachusetts.  Posing as Adams, MUSAU provided the bank with the same address (the OKUO Dorchester address) that she used in opening multiple Bank of America accounts in her own name:



| Fig. 16.1: Address for Bank of America Adams account | Fig. 16.2: Address for MUSAU Bank of America account -6331 | Fig. 16.3: Address for MUSAU Bank of America account -4554 |
|---|---|---|

79.     In or about May 2020, the Bank of America Adams account received more than $22,000 in wire transfers and deposits, including proceeds of the romance scams discussed above. Shortly thereafter, MUSAU quickly withdrew funds in structured amounts.

80.     For example, in or about May 2020, CC-3 told Victim-2 that his "commander" would need to be paid off for him to leave the military and return to the United States.  CC-3 instructed Victim-2 to send $8,000 to an account in the name of Precious Adams:



Fig. 17.1, 17.2: Messages
between Victim-2 and CC-3

81.    On or about May 18, 2020, the Bank of America Adams account received the $8,000 wire transfer from Victim-2.  On or about the same day, MUSAU withdrew $7,800 of those romance scam proceeds in six separate transactions in and around Boston.  On or about May 29, 2020, MUSAU withdrew the remaining funds in the Bank of America Adams account and abandoned it.

82.    As a final example, on or about May 30, 2019, MUSAU used the same fake South Africa passport in the name of Adams to open an East Boston Savings Bank account ending in -8503 (the "EBSB Adams account") in Boston, Massachusetts.  In opening the account, MUSAU provided the bank with the OKUO Dorchester address and the OKUO Hotmail address.

83.    In or about September 2019, the EBSB Adams account received more than $51,000 in wire transfers and deposits.  Shortly after these wire transfers, MUSAU quickly withdrew funds from the account in structured amounts.

84.     For example, on or about September 10, 2019, the EBSB Adams account received a wire transfer of approximately $10,100, and during the following three days, MUSAU withdrew $10,000 at four different branch and ATM locations in and around Boston.  On or about September 16, 2019, the EBSB Adams account received a wire transfer, from the same woman, of approximately $17,000, and during the following two days, MUSAU withdrew $17,000 in two separate branch transactions in and around Boston.  Finally, on or about September 24, 2019, the EBSB Adams account received a $20,500 wire transfer from the same woman, and during the following two days, MUSAU withdrew more than $17,000 in several ATM and branch transactions in and around Boston.

85.     In or about October 2019, MUSAU abandoned the EBSB Adams account with a minimal balance.

86.     MUSAU also used the alias Catherine Muthoki in opening bank accounts to launder and access the proceeds of fraudulent schemes.

87.     For example, on or about April 6, 2019, MUSAU used the alias Catherine Muthoki to open a Santander Bank account ending in -0257 (the "Santander Muthoki account").  To open the account, MUSAU used the OKUO Hotmail address and the OKUO Dorchester address, and she provided a Great Britain passport in the name of Muthoki, with a passport number of 973615249 and a date of birth of 10/03/1989.  I am aware, based on a review of records, that no individual using the name Catherine Muthoki with that date of birth and passport number has entered the United States.  An image of the fake Muthoki passport is below, compared to a photograph that MUSAU used in applying for a United States tourist visa in or about 2017:





*Fig. 18.1: Catherine Muthoki fake passport*

*Fig. 18.2: Photograph from MUSAU visa application*

88.     From in or about April 2019 to approximately June 2019, this account received more than $50,000 in wire transfers and deposits, and MUSAU quickly depleted the funds through structured cash withdrawals.

89.     For example, on or about May 13, 2019, the Santander Muthoki account received $20,000 in romance scam proceeds from Victim-1.  Beginning approximately 12 hours later, and over the following week, MUSAU withdrew $16,200 during five separate teller transactions, and she withdrew an additional $3,400 in five separate ATM withdrawals, for a total of $19,600.

90.     Further, on or about May 28, 2019, the Santander Muthoki account received another $20,000 wire transfer from Victim-1.  Beginning approximately 12 hours later, and over the following week, MUSAU withdrew $16,000 during three separate teller transactions and an additional $3,600 during four separate ATM withdrawals, for a total of $19,600.

91.     Accordingly, of the $40,000 in romance scam proceeds wired from Victim-1 to the Santander Muthoki account in May 2019, MUSAU withdrew $39,200 in seventeen separate structured transactions in and around Boston.

29

92.     In or about July 2019, MUSAU abandoned the Santander Adams account.

93.     On or about May 6, 2019, MUSAU used the same fake passport in the name of Muthoki to open a bank account ending in -4684 at TD Bank (the "TD Muthoki account").  In opening the account, MUSAU used the OKUO Hotmail address and provided the bank with the OKUO Dorchester address—the same address that she used in opening multiple other TD Bank accounts in her own name:[6]



| Fig. 19.1: Address for TD Muthoki account | Fig. 19.2: Address for MUSAU TD Bank account -2094 | Fig. 19.3: Address for MUSAU TD Bank account -9103 |

94.     From in or about May 2019 through September 2019, this account received more than $15,000 in wire transfers and deposits, and MUSAU quickly withdrew the funds in structured amounts.

95.     For example, on or about July 22, 2019, the TD Muthoki account received approximately $9,550 in wire transfers.  Starting the following day and during the ensuing week, MUSAU withdrew approximately $9,400 in seven separate teller and ATM withdrawals, including

---

[6] While the address for the TD Muthoki account was listed as "Wilcox St." rather than "Wilcock St.", I believe this is a typographical error.

a $5,000 withdrawal on July 23 during which MUSAU presented the bank with the Muthoki passport as identification, reflected on the withdrawal receipt:



Fig. 20: MUSAU withdrawal
from TD Muthoki Account

96.    OKUO has also used the aliases Mark Robert and Frank Michael in opening bank accounts to withdraw and launder funds that, based on my training and experience and this investigation, I believe are the proceeds of fraudulent schemes.

97.    For example, on or about March 24, 2017, OKUO used the alias Mark Robert to open a Bank of America account ending in -0389 (the "Bank of America Robert account").  To open the account, OKUO provided the bank with a Nigerian passport in the name of Robert, with a passport number of A02693941 and a date of birth of 06/06/1979 (the same date of birth as OKUO).  I am aware, based on a review of records, that no individual using the name of Mark Robert with that date of birth and passport number has entered the United States.

98.    From in or about April 2017 through June 2017, this account received more than $149,000 in wire transfers and deposits, and after receiving those transfers and deposits, OKUO quickly withdrew the funds in structured transactions.  For example, on or about May 18, 2017, this account received a $45,000 wire transfer from an account in the name of a Colorado woman. Over the following week, OKUO withdrew approximately $44,000 in more than 10 separate teller and ATM withdrawals, including on or about May 19, 2017 at a Bank of America branch in

Roxbury, where he inadvertently added "Okuo" to his signature of "Mark Robert" on the withdrawal receipt:




Fig. 21.1, 21.2: OKUO withdrawal
from Bank of America Robert account

99.     On or about May 30, 2017, the Bank of America Robert account received a $55,300 wire transfer from the same account.  Beginning the following day and during the week that followed, OKUO withdrew approximately $50,000 in more than 10 separate teller and ATM withdrawals, including on or about June 8, 2017 at the same Bank of America branch in Roxbury:



Fig. 22: OKUO withdrawal from
Bank of America Robert account

100.    Likewise, on or about January 18, 2017, OKUO used the same fake passport in the name of Robert to open a savings account ending in -9651 and a checking account ending in -0539 (collectively, the "Santander Robert accounts") at a Santander Bank in Massachusetts.  In opening the Santander Robert accounts, OKUO provided the bank with the same telephone number that he has listed on immigration records.  OKUO also inadvertently signed the account opening documents in the name of Mark Robert as "OKUO":



Fig. 23: OKUO's signature on documents
opening Santander Robert accounts

101.    From approximately January 2017 through November 2017, the Santander Robert accounts received approximately $27,000 in wire transfers and deposits, and shortly after receiving these wire transfers, OKUO rapidly withdrew the funds via structured cash withdrawals.

102.    On or about October 27, 2017, OKUO used the alias Frank Michael to open a Bank of America account ending in -5071 (the "Bank of America Michael account").  To open the account, OKUO provided the bank with a Nigerian passport in the name of Michael, with a passport number of A04844884 and a date of birth of 06/06/1979 (the same date of birth as OKUO and the alias of Mark Robert).  I am aware, based on a review of records, that no individual using the name Frank Michael with that date of birth and passport number has entered the United States.  Below is a surveillance photograph of OKUO opening the account as Michael, accompanied by a Bank of America employee, at a branch location in Dorchester:



Fig. 24: OKUO opening Bank of America
Michael account

103.    From about October 2017 to December 2017, the Bank of America Michael account

received approximately $28,000 in wire transfers and deposits, and shortly after receiving those

transfers, OKUO rapidly withdrew the funds via structured cash withdrawals.  For example, on or

about December 27, 2017, the Bank of America Michael account received approximately $11,750

in wire transfers and credits.  Over the following two days, OKUO withdrew $11,500 in multiple

structured transactions at branches and ATMs, including an ATM withdrawal on or about

December 29, 2017 in Roxbury:



Fig. 25: OKUO withdrawal from Bank of
America Michael account

34

104.    In addition to using accounts in the names of aliases, MUSAU also used bank accounts in her own name in furtherance of fraudulent schemes.   For example, on or about November 6, 2018, MUSAU opened a TD Bank account ending in -2094 using her own Kenyan passport with a passport number of A2079021.  From approximately November 2018 through May 2020, this account received more than $107,000 in wire transfers and deposits, and shortly thereafter, MUSAU quickly withdrew funds from her account in structured amounts.

105.    As one example, on or about April 16, 2019, MUSAU's TD Bank account received $22,000 in romance scam proceeds from Victim-1.  Starting the following day, MUSAU withdrew $20,500 in four separate structured withdrawals, and an additional $1,000 in two ATM withdrawals, providing her Kenyan passport and United States visa as identification:






> *Fig. 26.1-26.4: MUSAU structured*
> *withdrawals from TD account -2094*
> *after wire from romance scam Victim-1*

106.    Similarly, on or about May 13, 2019, MUSAU's TD Bank account received an additional $20,000 in romance scam proceeds from Victim-1.  Starting the following day, MUSAU

quickly withdrew $19,000 in five separate structured teller withdrawals, providing her Kenyan passport and/or United States visa as identification each time.

### PROBABLE CAUSE TO BELIEVE THE SUBJECT PREMISES AND SUBJECT VEHICLES CONTAIN EVIDENCE, FRUITS, AND INSTRUMENTALITIES

107.    I also have probable cause to believe that (a) the Subject Premises described in Attachment A-1, and (b) the Subject Vehicles 1 and 2 described in Attachments A-2 and A-3, respectively, contain fruits, evidence, and instrumentalities of the Target Offenses, as described in Attachment B.

### A.    The Subject Premises

108.    Based on a review of utility and bank records, MUSAU and OKUO began residing at the Subject Premises in or about November 2020.  For example, on or about November 1, 2020, MUSAU established an account with utility provider Eversource for the Subject Premises, and as of March 2021, that account is active.[7]  As recently as February 2021, the Subject Premises was the address listed on several of MUSAU's personal bank accounts, including EBSB accounts ending in -6555 and -5795.[8]  Also, in or about December 2020, the "Canton Estates" apartment complex where the Subject Premises is located received a $1,794 payment for rent from one of OKUO's personal bank accounts, the EBSB OKUO account.  Further, according to a review of records, OKUO has an active subscription for high-speed internet services at the Subject Premises.

109.    I have also confirmed that MUSAU and OKUO reside at the Subject Premises

---

[7] In registering service for the Subject Premises with Eversource, MUSAU provided her known telephone number of 857-269-8461.

[8] The apartment number listed on the statements for MUSAU's personal bank account is "206," not "1206," but I believe that to be a typographical error because the apartment complex where MUSAU resides does not appear to have an apartment number 206.

based on physical surveillance.  For example, on or about January 31, 2021 at approximately 9:20 PM, I observed OKUO depart a Bank of America ATM in Canton and enter Subject Vehicle 1. OKUO drove directly to the Subject Premises and parked Subject Vehicle 1 outside.  On or about February 1, 2021 at approximately 1:00 AM, I returned to the Subject Premises and observed the car being driven by OKUO earlier in the evening, Subject Vehicle 1, parked outside the Subject Premises, next to Subject Vehicle 2.

110.    Based on my training and experience, I know that locations occupied by a target often contain evidence that will aid in establishing the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the government to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  Accordingly, I believe that it is likely that the Subject Premises, the residence of OKUO and MUSAU, will contain evidence of the Target Offenses, including without limitation clothing matching clothing worn in surveillance images and videos; passports and other identification documents in the name of OKUO, Terry, Robert, Michael, MUSAU, Adams, Muthoki, and any other aliases used to open bank accounts; passport stamps or other materials used to create counterfeit passports and other identification documents; bank account opening documents, monthly statements, debit cards, ATM receipts, and other banking materials in the names of OKUO, Terry, Robert, Michael, MUSAU, Adams, Muthoki, and any other aliases; ledgers and passwords associated with the fraudulent accounts; computers and telephones used to communicate with co-conspirators and victims; and cash.

111.    Although a number of months have passed since some of the bank accounts discussed above have been active, I believe that evidence of the Target Offenses will nevertheless be found at the Subject Premises.  For example, as discussed above, bank surveillance photographs

show OKUO and MUSAU wearing the same clothing in executing transactions in the fraudulent accounts, and based on my training and experience, people tend to keep clothing for many years and not discard it.

112.    As discussed below, I also expect that cellular phones and/or computers owned and used by OKUO and MUSAU will contain evidence of the Target Offenses, and in my experience, cellular phones and computers are typically found where targets reside.  Further, targets tend not to discard computers and cellular phones in my experience, and even if they do, targets frequently "backup" their computers and cellular phones to new devices, the cloud, or external hard drives, which may be found at the Subject Premises.

113.    Based on my training and experience, individuals who perpetrate fraudulent schemes and/or launder the proceeds also keep ledgers of proceeds, similar to drug traffickers, that often are found where they reside.

**B.    The Subject Vehicles**

114.    Based on my training, experience, and information obtained from other law enforcement agents, I understand that individuals who use fraudulent passports to access the proceeds of romance scams and other fraudulent schemes commonly store, among other things, fake identification documents, receipts, ledgers, and bank records inside their vehicles.[9]

115.    As previously noted, Subject Vehicle 1 is a black Lexus SUV with a Massachusetts license plate number of 1CPR39.[10]  As recently as January 31, 2021, I have witnessed OKUO

---

[9] *See, e.g.*, *United States v. Osei*, No. 1:21-cr-10064, ECF No. 11 at 2 (noting that in a similar romance scam case, law enforcement agents obtained a search warrant for the defendant's car and inside found fake passports, cash, and money orders).

[10] Although Subject Vehicle 1 is registered in the name of a person who resides in Dorchester (at a previous address of OKUO and MUSAU), neither MUSAU nor OKUO has a

driving this vehicle after exiting an ATM, and I have witnessed it parked outside the Subject Premises on numerous occasions, including as recently as March 2021.  Further, based on my training and experience, perpetrators of fraudulent schemes commonly attempt to evade detection by removing license plates from vehicles and placing them on new vehicles.  The license plate on Subject Vehicle 1 (1CPR39) was previously affixed to a red Toyota Prius, and surveillance cameras captured MUSAU executing transactions in the accounts above on numerous occasions, such as on or about June 21, 2020 and September 26, 2020 in the TD Adams account:



*Fig. 27.1, 27.2: MUSAU transactions in TD Adams account in vehicle with license plate 1CPR39 now affixed to Subject Vehicle 1*

116.    Subject Vehicle 2 is a green Toyota Camry with a license plate number of 5EA524. As recently as January 2021, I witnessed OKUO drive Subject Vehicle 2 to a Citizens Bank ATM in Roxbury, which he has used on previous occasions to withdraw funds from accounts in the names of his aliases.  Further, on or about December 29, 2020, OKUO was stopped by the Boston Police in Roslindale while driving Subject Vehicle 2 and cited for operating without a valid

---

valid active driver's license in Massachusetts, and therefore, they cannot have any vehicles registered in their names.

driver's license.  As recently as March 2021, I have witnessed Subject Vehicle 2 parked outside the Subject Premises, the residence of OKUO and MUSAU, near Subject Vehicle 1.  Further, surveillance cameras captured OKUO executing transactions in the accounts above while driving Subject Vehicle 2, such as on October 2, 2020 in the TD Adams account (see above).

## SEIZURE OF COMPUTER EQUIPMENT AND DATA

117.    There is probable cause to believe that electronic equipment was used to violate federal law, and that the equipment will be found at the Subject Premises and the Subject Vehicles.

118.    From my training and experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

119.    Further, based on my training, experience, and information provided by other law enforcement officers, I know that many cellular phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers.  Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence that reveals or suggests who possessed or used the device.

120.    From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in

40

computer hardware, computer software, smartphones, and storage media.

121.    Here, perpetrators communicated with romance scam victims on various dating websites and social media applications.  They also communicated with victims over e-mail, text message, and other computer and smartphone applications like Skype and WhatsApp.  Based on my training, experience, and information provided by other law enforcement officers, I know that romance scams often involve multiple conspirators.  Some conspirators communicate with victims, and others set-up accounts to receive and withdraw victim funds.  Often, these conspirators communicate with each other over e-mail or messaging applications to notify (i) the conspirators communicating with victims of the bank account information, and (ii) the conspirators withdrawing funds when to expect funds so that they can be withdrawn quickly.

122.    Further, OKUO and MUSAU provided banks with various e-mail addresses in opening the fraudulent bank accounts, including the OKUO Hotmail address.  Based on my training, experience, and information provided by other law enforcement officers, conspirators involved in romance scams often use e-mail alerts from banks to track incoming wire transfers and quickly withdraw funds.

123.    Based on my training, experience, and information provided by other law enforcement officers, I also understand that conspirators involved in romance scams frequently store ledgers, account information, and fraud-related communications on their smartphones. Below are photographs of OKUO using his smartphone while opening fraudulent bank accounts and withdrawing funds from those accounts:



Fig. 28: OKUO using smartphone while opening
TD Terry account and withdrawing funds

124.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

a.      Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.   Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b.      Even after files have been deleted, they can be recovered months or years later using forensic tools.   This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.   In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

42

c.      Wholly apart from user-generated files, computer storage media in particular, computers' internal hard drives contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."   The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.      Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record

43

information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (*e.g.*, registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime

44

under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (*e.g.*, a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in

45

advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

125.    Based on my knowledge, training, and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

a.      The volume of evidence that storage media, such as hard disks, flash drives, CDs, and DVDs, can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are

46

evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.      Technical requirements analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files.  Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches.  Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

c.      Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

126.   The Subject Premises and Subject Vehicles may contain computer equipment whose use in the crime or storage of the things described in this warrant is impractical to determine at the scene.  Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge.  In addition, technical, time, safety, or other constraints can prevent definitive

47

determination of their ownership at the premises during the execution of this warrant. If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

127.    The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B because they are associated with OKUO or MUSAU. For example, the agents will attempt to identify the cellular phones belonging to OKUO and MUSAU by calling their cellular phone numbers during the search, 617-318-8164 for OKUO and 857-269-8461 for MUSAU. If, however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, or if it appears that OKUO or MUSAU have more than one cellular phone and/or computer, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

128.    This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, law enforcement agents may deliver a complete copy of the seized, copied, or disclosed

48

electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## UNLOCKING DEVICES USING BIOMETRIC FEATURES

129.    As discussed above, a review of photographs and records indicates that it is likely that the Subject Premises and Subject Vehicles will contain at least one cellular phone belonging to OKUO or MUSAU.  I know from my training and experience, as well as from information found in publicly available materials, that some models of cellular phones made by Apple and other manufacturers offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

130.    For example, on the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID.  If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor.  In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked; and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if: (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

131.    The passcode that would unlock the Apple iPhone or other devices found during the search of the Subject Premises and Subject Vehicles is not currently known to law enforcement.

49

Thus, it may be useful to press the finger(s) of the user(s) of to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

132.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Subject Premises or Subject Vehicles to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

133.    For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the Subject Premises or in the Subject Vehicles to the sensor of the devices or place the devices in front of their faces for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

## CONCLUSION

134.    Based on my knowledge, training and experience, and the facts as set forth in this affidavit, I have probable cause to believe and I do believe that OKUO and MUSAU committed

conspiracy to commit wire and bank fraud, in violation of Title 18, United States Code, Section 1349, and that evidence fruits, and instrumentalities of the crimes described in Attachment B are contained within the Subject Premises described in Attachment A-1 and within the Subject Vehicles described in Attachment A-2 and Attachment A-3.

Respectfully submitted,

/s/ Brendan Cullen

_____
Brendan Cullen, Special Agent
Department of Homeland Security

Subscribed and sworn to me telephonically on March __, 2021.
22

_____
The Honorable M. Page Kelley
Chief Magistrate Judge
United States District Court for the District of Massachusetts

51